UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KHALIL MUSLEH ABDO AL SHALELI, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ANTONY J. BLINKEN, U.S. SECRETARY OF STATE; et al.,<br><br>Defendants. | Case No.: 1:22-cv-01244-JLT-SAB<br><br>ORDER DENYING EX PARTE REQUEST FOR PRELIMINARY INJUNCTION<br><br>(Doc. 5) |

## I. INTRODUCTION

On September 29, 2022, Plaintiffs, six of whom are nationals of Yemen who were selected for the Fiscal Year 2022 "Diversity Visa" program ("Applicant Plaintiffs"), filed this action against various officials of the United States, including Antony J. Blinken, the U.S. Secretary of State. (Doc. 1.) Very generally, the "diversity visa program makes as many as 55,000 visas available annually to citizens of countries with low rates of immigration to the United States." *Shahi v. U.S. Dep't of State*, 33 F.4th 927, 928 (7th Cir. 2022) (citing 8 U.S.C. §§ 1151(e), 1153(c)). Because the number of diversity visa selectees typically exceeds the number of available visas, the Department of State ("DOS") holds a lottery to determine priority. *Id*. at 928. Lottery winners are eligible to receive a visa only during the fiscal year in which they are selected to apply. 8 U.S.C. § 1153(e)(2); 22 C.F.R. § 42.33(f). Selectees can then submit a visa application

1

1   and receive a "rank order" that determines the order in which they may be scheduled for an

2   interview to have their application adjudicated. *See* 22 C.F.R. §§ 42.33(b)–(d). Because the

3   diversity visa program restarts each fiscal year, consular officers may not issue diversity visas

4   after midnight on the last day of the fiscal year—September 30th. 22 C.F.R. §§ 42.33(a)(1), (d),

5   (f); *see* 31 U.S.C. § 1102.

6        Plaintiffs allege that their visa applications had not been adjudicated as of September 29,

7   2022, the day before the deadline. (*See generally* Doc. 1) They claim that DOS has "unlawfully

8   withheld" and/or "unreasonably delayed" the processing of their applications in violation of the

9   Administrative Procedure Act, 5. U.S.C. § 701, et seq. (Doc. 1 at ¶¶ 58, 76–90.) They also claim

10  entitlement under the Mandamus Act, 28 U.S.C. § 1361, to an order compelling Defendants to

11  discharge their statutory duties. (Doc. 1 at ¶¶ 91–106.)

12       On the same day they filed their complaint, Plaintiffs filed an *ex parte* motion for

13  emergency injunctive relief along with voluminous exhibits. (Doc. 5.) The motion requests an

14  order that would require Defendants to "hold out" diversity visa numbers past the September 30,

15  2022, fiscal year deadline for the Applicant Plaintiffs and their derivatives. (Doc. 2-2 at 25.)

16       The Court ordered service upon Defendants and set the matter for hearing the next day,

17  September 30, 2022. (Doc. 8.) In the late morning of September 30, the United States filed an

18  opposition (Doc. 13); shortly thereafter, Plaintiff's filed a reply (Doc. 14). Plaintiffs' counsel the

19  United States appeared via Zoom videoconference at 2:30 pm pacific time. The Court has read

20  and considered the entire record to the best of its ability given the limited time it has had to

21  dedicate to this matter.

22           **II.   LEGAL STANDARDS**

23       Injunctive relief is an "extraordinary remedy, never awarded as of right." *Winter v. Nat'l*

24  *Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). As such, the Court may only grant such relief

25  "upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 22. To prevail, the moving

26  party must show: (1) a likelihood of success on the merits; (2) a likelihood that the moving party

27  will suffer irreparable harm absent preliminary injunctive relief; (3) that the balance of equities

28  tips in the moving party's favor; and (4) that preliminary injunctive relief is in the public interest.

*Id*. Local Rule 231 governs the filing of requests for TROs in this District. Relatedly, mandamus is a "drastic and extraordinary" remedy. *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004).

### III.  ANALYSIS

**A.  Plaintiffs' Visa Applications Appear to Have Been Denied.**

Attached to the Government's reply is the declaration of Maria Rosales, an attorney adviser in the Office of the Assistant Legal Adviser for Consular Affairs within the U.S. Department of State ("DOS"). (Doc. 13-1.) Ms. Rosales has authorization to search DOS's electronic Consular Consolidated Database for records of non-immigrant and immigrant visas cases at U.S. embassies and consulates overseas. (*Id*., ¶ 1.) She states that as of September 30, 3033, five of the six Applicant Plaintiffs reflected that "on September 30, 2022, the consular officer refused Plaintiff's visa application under 8 U.S.C. § 1153(c)." (*Id*., ¶¶ 6, 7, 12, 18, 21.) As to all six Applicant Plaintiffs Ms. Rosales attests that there is at least some record indicating that the application was formally denied and that subsequent documentation did not overcome that denial.

More specifically, the electronic records reflect the following:

- As to Plaintiff Nabil Hail Ahmed Yahya Haggag (#2022AS00003433), after appearing for a consular interview on May 24, 2022, the consular officer refused the application and requested additional documentation. (*Id*., ¶ 3.) Additional documentation was submitted May 31, 2022, but the consular officer determined Plaintiff Haggag had not overcome the prior refusal and informed Plaintiff as much. (*Id*., ¶ 4.) On September 6, 2022, Plaintiff Haggag submitted additional educational records, but after review the consular officer again determined Plaintiff had not overcome the prior refusal and informed Plaintiff of that decision. (*Id*., ¶ 5.) Once again on September 25, 2022, Plaintiff Haggag provided additional documents, which were again determined to be insufficient. The consular database reflects that on September 30, 2022, Plaintiff Haggag's visa application was refused under 8 U.S.C § 1153(c). (*Id*., ¶ 6.)
- As to Plaintiff Mohammed Rafeq Mohammed Qudam (#2022AS00004181), after

3

1 appearing on June 26, 2022, for a consular interview, the consular officer refused
2 Plaintiff's visa application under 8 U.S.C. § 1153(c). (*Id*., ¶ 7.) On August 30, 2022,
3 Plaintiff provided additional documents regarding his education, but the consular
4 officer determined that Plaintiff had not overcome the prior refusal, and on September
5 14, 2022, the consular officer informed Plaintiffs' counsel of that decision. (*Id*., ¶ 8.)

- As to Mohammed Esmail Qasem Hasan Al-Shawkhi (#2022AS00007861), after appearing at a consular interview on July 28, 2022, the consular officer refused Plaintiff's visa application under 8 U.S.C. § 1201(g) that same day. (*Id*., ¶ 9.) On August 22, 2022, Plaintiff Al-Shawkhi provided additional documents regarding his education, but the consular officer determined that Plaintiff had not overcome the prior refusal, and informed Plaintiff of the same. (*Id*., ¶ 10.) On September 25, 2022, Plaintiff Al-Shawkhi again provided additional documents regarding his education, but again the consular officer determined that Plaintiff had not overcome the prior refusal, and the consular officer refused Plaintiff's visa application under 8 U.S.C. § 1153(c). (*Id*., ¶¶ 11–12.)

- As to Plaintiff Wadah Musleh Abdo Al-Shaleli (#2022AS00026428), after appearing for a consular interview on July 28, 2022, the consular officer refused Plaintiff's visa application under 8 U.S.C. § 1201(g) on the same day and requested Plaintiff provide additional documentation to establish his education. (*Id*., ¶ 13.) On August 23, 2022, Plaintiff Al-Shaleli provided additional documents regarding his education, but after review of those documents the consular officer determined that Plaintiff had not overcome the prior refusal. (*Id*., ¶ 14.) On September 13, 2022, Plaintiff again provided additional documents regarding his education, but the consular officer again determined that Plaintiff had not overcome the prior refusal and informed Plaintiffs' counsel of the same. (*Id*., ¶ 15.) Additional documents were provided yet again on September 25, 2022, but again they were found insufficient to overcome the prior refusal. (*Id*., ¶ 16.) Finally, on September 28, 2022, Plaintiff provided yet more documents regarding his education. On September 30, 2022, the consular office

4

refused Plaintiff Al-Shaleli's application under 8 U.S.C. 1153(c). (*Id.*, ¶¶ 16–17.)

- As to Plaintiff Tareq Saif Ali Al-Awdi (#2022AS00014634) after appearing for a consular interview on August 25, 2022, the consular officer refused Plaintiff's visa application on the same day under 8 U.S.C. § 1201(g). (*Id.*, ¶ 19.) On September 20, 2022, Plaintiff Al-Awdi provided additional documents regarding his education, but on the same day the consular officer requested Plaintiff and his derivative family member submit a DS-5535.[1] (*Id.*, ¶ 20.) On September 30, 2022, the consular officer refused Plaintiff Al-Awdi's visa application under 8 U.S.C. § 1153(c). (*Id.*, ¶ 21.)

- Finally, as to Plaintiff Abdullah Saleh Nasser Salem (#2022AS00009109), after a consular interview on July 28, 2022, the consular officer refused Plaintiff's visa application under 8 U.S.C. § 1201(g) the same day and requested Plaintiff Salem provide additional documentation to establish his educational qualifications. (*Id.*, ¶ 22.) On September 20, 2022, Plaintiff provided additional documents regarding his education, but the consular officer determined that Plaintiff had not overcome the prior refusal. (*Id.*, ¶ 23.)

Accordingly, the Court finds that Plaintiffs' visa applications have all been denied and that even though some were afforded the opportunity to try to overcome those denials, they failed to do so.[2] It appears that DOS may not have clearly and consistently communicated the status of these applications to Plaintiffs, but any such failure to communicate is not a matter that is presently before the Court.

**B.     The Doctrine of Consular Non-Reviewability**

The primary consequence of this finding is that it triggers the application of the doctrine of consular non-reviewability. Under that doctrine, this Court lacks jurisdiction to adjudicate a challenge to a final determination by a consular official regarding a visa application. "[I]t has

---

[1] The Court takes judicial notice of the fact that this is a form requesting supplemental information about various subjects, including travel history, relatives, and employment history. See DS-5535, Supplemental Questions for Visa Applicants, *available at*: https://in.usembassy.gov/wp-content/uploads/sites/71/DS-Form-5535.pdf (last visited September 30, 2022).

[2] The Court noted at the hearing that Ms. Rosales' Declaration does not attach any exhibits to support her statements. Defendants are directed to supplement the record within five business days with appropriate exhibits to complete the record.

5

been consistently held that the consular official's decision to issue or withhold a visa is not subject either to administrative or judicial review," subject to certain, limited exceptions. *Bustamante v. Mukasey*, 531 F.3d 1059, 1061 (9th Cir. 2008) (internal citation and quotation omitted). As construed by the Ninth Circuit in *Cardenas v. United States*, a two-part test applies for determining whether an exception to the doctrine applies. 826 F.3d 1164 (9th Cir. 2016), "First, the consular officer must deny the visa under a valid statute of inadmissibility." *Id*. at 1172 (internal citation and quotation omitted). "Second, the consular officer must cite an admissibility statute that specifies discrete factual predicates the consular officer must find to exist before denying a visa, or there must be a fact in the record that provides at least a facial connection to the statutory ground of inadmissibility." *Id*. "Once the government has made that showing, the plaintiff has the burden of proving that the reason was not bona fide by making an affirmative showing of bad faith on the part of the consular officer who denied [the] visa." *Id*. "This test is the only recognized exception to consular non-reviewability; there is no separate right under the APA to review a consular officer's visa denial." *Munoz v. United States Dep't of State*, 526 F. Supp. 3d 709, 718–19 (C.D. Cal. 2021)

Though Plaintiffs' counsel hypothesized at the hearing as to possible ways Plaintiff might be able to show bad faith here, there is, from a practical perspective, no time left to develop such a showing because the deadline for this fiscal years' diversity visa lotter is **today**. As such, Plaintiffs reiterate their request for the Court to "set aside" enough visas from the current pool so that they might be available to issue to Applicant Plaintiffs and their derivatives after the deadline.

**C.      Set Aside is Not an Appropriate Remedy Under the Circumstances**

Plaintiffs point to several cases in which courts have "reserved" or "set aside" diversity visa "slots" for those in the diversity visa program to allow time for legal claims to proceed. In *Gomez v. Trump*, cited in Plaintiff's brief (Doc. 2-2 at 7), the district court had previously found that DOS had unlawfully refused to review and adjudicate FY 2020 diversity visa selectees' visa applications pursuant to Presidential Proclamation 10014 (which the court referred to as the "No-Visa Policy"), had unreasonably delayed processing those applications, and had arbitrarily and

capriciously failed to explain its exclusion of such applications from its "COVID-19 Guidance" setting forth the categories of visa applications eligible for "mission critical" and "emergency" processing. 490 F. Supp. 3d 276, 281 (D.D.C. 2020), appeal dismissed, No. 20-5332, 2020 WL 7688214 (D.C. Cir. Dec. 14, 2020). As a remedy for these violations, the court ordered Defendants to, among other things, "undertake good-faith efforts, directly and through their designees, to expeditiously process and adjudicate DV-2020 diversity visa and derivative beneficiary applications." *Id*. at 281–82. Although visa adjudication did speed up, by September 24, 2020, the total number of diversity visas issued for FY 2020 was approximately 15,401, roughly 28 percent of the 55,000 visas annually afforded under the INA. *Id*. at 282.

The *Gomez* plaintiffs later sought an order that would require DOS to reserve approximately 30,000 diversity visas beyond the fiscal year pending final resolution of the lawsuit. *Id*. at 288–89. The court thoroughly examined the existing caselaw concerning its authority to issue such relief, nothing prior D.C. Circuit authority holding that where a plaintiff filed suit and the court grants some relief—but not the visa—before October 1, a court "might lawfully take steps to compel the government to process the plaintiff's application after the fiscal year has ended." *Id* at 284 (*citing Almaqrami v. Pompeo*, 933 F.3d 774, 781–82 & n.2 (D.C. Cir. 2019)). In such a circumstance, "a post-deadline order would permissibly 'give effect to the district court's prior directive, entered before the end of the selection FY, to preserve an essential (and otherwise expiring) ingredient of relief.'" *Id*. (*quoting Almaqrami*, 933 F.3d at 782). *Gomez* also noted that in analogous circumstances, courts have suspended the operation of other statutory lapse provisions. *Id*. at 285–86 (citing cases).

Among other things, the *Gomez* court found notable the fact that "that the delay in processing of Plaintiffs' applications is largely due to Defendants' own unlawful interpretation of Presidential Proclamation 10014 and 8 U.S.C. § 1201(g)—it is in no way the fault of Plaintiffs themselves." *Id*. at 285. Moreover, in rejecting the defendants' argument that the court was in effect asking DOS to "render performance that is impossible," the court noted that DOS had "not even attempted to shoulder the 'heavy burden' of demonstrating that 'resource constraints' or other 'practical challenges' render it impossible to reserve and potentially process diversity visas

7

after September 30. *Id*. at 286 (*quoting Am. Hosp. Assoc. v. Price*, 867 F.3d 160, 168 (D.C. Cir. 2017)). Finally, in rejecting the defendants' suggestion that an order to reserve visas would run afoul of Congress's intent, the court emphasized that it had "already found that Defendants violated Congress's design when they ***nearly extinguished*** the FY 2020 diversity visa program through their No-Visa Policy." *Id*. (emphasis added); *see also Goodluck v. Biden*, 1:21-cv-01530-APM (Docs. No. 46, 62) (reserving almost 7,000 visas for similar reasons in light of a "No-Visa" policy).

More than 900 diversity visas were "reserved" under somewhat similar circumstances in *Rai v. Biden*, 567 F. Supp. 3d 180, 192 (D.D.C. 2021), order clarified sub nom. *Rai v. Blinken*, No. 21-CV-863-TSC, 2021 WL 5765883 (D.D.C. Oct. 25, 2021). There, the plaintiffs challenged a regional "No-Visa" Policy suspending the issuance of visas to persons from certain countries pursuant to Presidential Proclamation Nos. 9984 and 10143. *Id*. at 188. For various reasons, a "No-Visa" policy remained applicable to diversity visa applicants from those regions until April 2021, precluding the processing of applications for the first six months of the fiscal year. *See id*. at 192. *Rai* found that plaintiffs were likely to succeed on their claim that implementing that "No-Visa" policy as to diversity visa applicants during that timeframe was unlawful. *Id*. at 194–96. The court further found that during the missing six months of possible diversity visa application processing, "embassies and posts could have issued approximately 966 diversity visas" but for the unlawful policy. *Id*. at 203.

The Court finds these cases distinguishable. Most importantly, they concerned allegations of programmatic policies and/or procedures that effectively blockaded the diversity visa program as a whole (or in large part) for extended periods of time. These cases stand for the proposition that a court must have some power to ensure that the existence of a statutory deadline for visa processing does not afford government agencies and officials a blank check to flagrantly violate the law. The problem with extending the logic of these cases to the present circumstances is a practical one: there would be no stopping point. This case was filed at the 11th hour, one day before the statutory deadline, giving the Court and the Government almost no time to consider or

address the factual or legal circumstances presented.[3] Moreover, given the current procedural posture, the ball is in Plaintiff's court to demonstrate bad faith, which they have simply run out of time to even attempt to do. To set aside visas for these Plaintiffs under these circumstances would open the floodgates to countless, similar, last-second requests for such relief with records too threadbare to support any kind of finding of likelihood of success.

The Court recognizes that this case has enormous personal consequences for the Plaintiffs and that, like many hopeful immigrants to this country, Plaintiffs found themselves stuck in a procedural morass. Nonetheless, regretfully, the Court finds that the record does not permit the relief Plaintiffs are requesting. The motion for preliminary injunctive relief is DENIED.

IT IS SO ORDERED.

Dated:   **September 30, 2022**

*/s/ Jennifer L. Thurston*
UNITED STATES DISTRICT JUDGE

---

[3] As was noted by a judge of this Court in *Council on Am.-Islamic Rels., California v. Blinken*, No. 2:22-CV-01500-TLN-KJN, 2022 WL 4472914, at *3 (E.D. Cal. Sept. 26, 2022), "Plaintiffs' delay arguably warrants outright denial of this motion. Under the Court's Local Rules, a court faced with a TRO 'will consider whether the applicant could have sought relief by motion for preliminary injunction at an earlier date without the necessity for seeking last-minute relief.' E.D. Cal. L.R. 231(b)."